UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TYRONE BLEDSOE,            ) | |
| )                          | |
| Plaintiff,   ) | |
| )                          | |
| v.                         ) | No. 1:18-cv-04077-JPH-MPB |
| )                          | |
| MELISSA LAWRENCE,          ) | |
| ANDREW LIAW,               ) | |
| LORETTA DAWSON,            ) | |
| PERSON,                    ) | |
| J. SCISM,                  ) | |
| )                          | |
| Defendants.  ) | |

**ORDER GRANTING DEFENDANTS' UNOPPOSED MOTIONS
FOR SUMMARY JUDGMENT
AND DIRECTING FINAL JUDGMENT**

Inmate Tyrone Bledsoe alleges that the defendants violated his Eighth Amendment rights when they were deliberately indifferent to his knee pain. Defendants have moved for summary judgment, and Mr. Bledsoe has not responded. For the reasons explained in this Order, the defendants' motions for summary judgment, dkt. [50] and dkt. [56], are **granted**.

### I. Procedural Background

Plaintiff Tyrone Bledsoe is an Indiana Department of Correction ("IDOC") inmate currently housed at Westville Correctional Facility ("WCF"). Mr. Bledsoe filed this action pursuant to 42 U.S.C. § 1983 alleging deliberate indifference to his knee pain while at WCF and Correction Industrial Facility ("CIF"). Dkt. 1. The Court screened Mr. Bledsoe's complaint and allowed his deliberate indifference claims against all defendants to proceed. *See* dkt. 8 at 2 (screening entry).

1

During the timeframe covered by Mr. Bledsoe's claims, there were two different IDOC medical contractors. Corizon Health, Inc. ("Corizon")[1] was the company contracted with the IDOC to provide medical care to inmates from 2015 to March 31, 2017, at which time Wexford of Indiana, LLC ("Wexford") became the new medical provider for the IDOC.

Corizon defendants Dr. Andrew Liaw, Dr. Michael Person, and Nurse Melissa Lawrence filed their motion for summary judgment with respect to events that occurred before March 31, 2017, dkt. [50].

Wexford defendants Dr. Andrew Liaw, Dr. Michael Person, Nurse Melissa Lawrence, Nurse Practitioner Loretta Dawson, and Health Services Administrator ("HSA") Joshua Scism filed their motion for summary judgment with respect to events that occurred after March 31, 2017, dkt. [56]. Mr. Bledsoe did not file a response to either motion, both of which are now ripe for the Court's resolution.[2]

## II. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed.

---

[1] On February 11, 2020, counsel appeared in this matter on behalf of Corizon defendants for Mr. Bledsoe's claims from 2015 to March 31, 2017, when Corizon was the medical provider with the IDOC. Dkt. 43; dkt. 44.

[2] The Court notes that the Wexford defendants served on Mr. Bledsoe a Notice Regarding Right to Response and Submit Evidence in Opposition to Motion for Summary Judgment by U.S. First Class Mail on March 31, 2020. Dkt. 59. The Corizon defendants served on Mr. Bledsoe their motion for summary judgment and related filings, including memorandum and supporting exhibits by U.S. First Class Mail on April 3, 2020. Dkt. 63.

R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017).

By not responding to Defendants' motions for summary judgment, Mr. Bledsoe concedes their version of the facts. *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *Brasic v. Heinemann's Inc.,* 121 F.3d 281, 286 (7th Cir. 1997). This does not alter the standard for assessing a Rule 56

motion but does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn,* 129 F.3d 419, 426 (7th Cir. 1997).

### III. Material Facts

#### A. The Parties

Mr. Bledsoe was incarcerated at WCF between 2014 and 2015 for aggravated theft. Dkt. 58-1 at 11, 14–15; dkt. 52-2, ¶ 6. He was reincarcerated at CIF in 2016 for aggravated battery. Dkt. 58-1 at 7–8.

Dr. Liaw is a licensed physician practicing in Indiana and was employed by Corizon at WCF. Dkt. 52-2, ¶¶ 2, 5. Dr. Person is a licensed physician practicing in Indiana and was employed by Corizon at CIF between 2016 through March 31, 2017. Dkt. 52-3, ¶¶ 2, 5. Dr. Person continued employment at CIF under Wexford. *Id.*

Melissa Lawrence is a registered nurse licensed to practice in Indiana and was employed by Corizon at CIF between 2016 and March 31, 2017. Dkt. 52-4, ¶¶ 3-4. Nurse Lawrence continued employment at CIF under Wexford. *Id.* Loretta Dawson is a nurse practitioner licensed to practice in Indiana and has been employed by Wexford since April 1, 2017. Dkt. 58-8, ¶¶ 1-3.

Joshua Scism was the HSA at CIF and was employed by Wexford in this position between January 1, 2018 and February 2019. Dkt. 58-5, ¶ 1.

#### B. Plaintiff's Medical Treatment by Dr. Liaw at WCF (2015)

Mr. Bledsoe arrived at WCF on February 17, 2015. Dkt. 52-6 at 11–12. He submitted a healthcare request form on April 15, 2015 regarding knee pain and swelling. *Id.* at 13. A week later, he saw a nurse practitioner, and she found his knee had medial and lateral tenderness with an ache to his inner thigh. *Id.* at 14–16. Mr. Bledsoe's knee appeared to be swollen and was x-rayed, but no fracture, tissue swelling, joint narrowing, or dislocation was present. *Id.* The nurse

practitioner gave Mr. Bledsoe Ibuprofen 200 mg and advised him to elevate his knee during the day and to alternate with warm and cold compression. *Id.* A knee brace was ordered as well as a follow-up evaluation, lab studies, and a right knee CT scan. *Id.*

Mr. Bledsoe submitted a second healthcare request about his knee pain and swelling on April 26, 2015. *Id.* at 17. Mr. Bledsoe was scheduled for a chronic care clinic appointment on May 12, 2015, and radiological testing was pending for his knee. *Id.* The nurse practitioner ordered an MRI and was awaiting these test results to determine further treatment evaluation in response to Mr. Bledsoe's continued knee pain. *Id.* at 18–23. An MRI was conducted on March 20, 2015, and indicated a complex medial meniscal tear, medial compartment degenerative change, joint effusion/Baker's cyst, and a subtle undersurface tear of the later meniscus anterior horn. *Id.* at 24.

Dr. Liaw saw Mr. Bledsoe on only one occasion—June 8, 2015. Dkt. 52-2, ¶¶ 7-8; dkt. 52-6 at 25-29. Dr. Liaw reviewed Mr. Bledsoe's records and noted the recent MRI and that the nurse practitioner had been treating his knee. *Id.* Dr. Liaw "tried to read the scanned copy of the MRI in the electronic medical records, but it was illegible," and he referred Mr. Bledsoe back to the nurse practitioner for further care. *Id.* He ordered Toradol for Mr. Bledsoe's pain and issued a bottom bunk pass for one month. *Id.* Dr. Liaw provided no further treatment to Mr. Bledsoe after this date and did not treat him while he was incarcerated at CIF from 2017 through 2019. *Id.* Mr. Bledsoe was released on parole on June 29, 2015. Dkt. 52-6 at 30–31.

### C. Plaintiff's Medical Treatment After Reincarceration at CIF (2016-2018)

Mr. Bledsoe was reincarcerated and transferred to CIF in May 2016 and did not report complaints about his right knee during the intake process. *Id.* at 32–57. The medical records indicate that Mr. Bledsoe did not seek treatment for his knee until February 1, 2017, when he submitted a healthcare request form that his knee was painful and swollen. *Id.* at 66.

5

### 1. Nurse Lawrence Interactions

On February 3, 2017, Nurse Lawrence saw Mr. Bledsoe, and he reported that he had started experiencing symptoms on January 27, 2017, when he woke up with his right knee swollen. Dkt. 52-4, ¶¶ 7-8; dkt. 52-6 at 67–70. He reported that he had not done anything out of the ordinary that would have caused an injury and denied any previous history. *Id.* Nurse Lawrence indicated that Mr. Bledsoe's knee was swollen, his gait was not normal, and that he could move his knee but that there appeared to be stiffness. *Id.* She gave Mr. Bledsoe an ace wrap and instructed him to elevate the knee and to utilize ice and heat compression and referred him to a provider. *Id.* At this time, Nurse Lawrence was employed by Corizon.

Nurse Lawrence did not encounter Mr. Bledsoe again until approximately four months later, and at this time, she was employed by Wexford. On June 17, 2017, Mr. Bledsoe did not show up for a scheduled Nursing Sick Call appointment for his knee pain. Dkt. 52-4, ¶ 9. She rescheduled his appointment, and he was seen the following day. *Id.* Nurse Lawrence attested that during this visit she told him that he had already been seen by the provider and had been prescribed medication for a gout-flare up. *Id.* She "encouraged Mr. Bledsoe to take his medications as prescribed" as she noted "medication compliance issues." *Id.* At this time, Mr. Bledsoe was already on the schedule for a follow-up visit with the provider and was seen on June 26, 2017. *Id.* Nurse Lawrence did not treat Mr. Bledsoe for his knee issues after June 18, 2017. *Id.*, ¶¶ 10-11.

### 2. Dr. Person Interactions

Prior to February 2017, Dr. Person had only seen Mr. Bledsoe in the chronic care clinic for hypertension. Dkt. 52-3, ¶¶ 7-8. On February 9, 2017, Dr. Person saw Mr. Bledsoe for knee swelling and pain. *Id.*, ¶ 9; dkt. 52-6 at 71–75. Dr. Person found that Mr. Bledsoe's right knee was hot, swollen, and tender, and that he experienced moderate pain with range of motion. Dkt. 52-3,

¶ 9; dkt. 52-6 at 71–75. Dr. Person determined that Mr. Bledsoe had a gout flare-up, "which is an inflammatory process typically occurring in the lower extremities . . . [that] can appear clinically indistinguishable from arthritis and can mimic trauma." *Id.* Because Mr. Bledsoe had not reported a history of arthritis or past or current trauma, Dr. Person "determined that he was likely experiencing a gout flare" and prescribed Prednisone, a corticosteroid for the inflammation. *Id.* He told Mr. Bledsoe to refrain from working for two days. *Id.*

Mr. Bledsoe submitted another healthcare request on March 1, 2017, because he said the medication was not working and his knee was still swollen. Dkt. 52-6 at 76. Dr. Person saw Mr. Bledsoe for the last time two days later. Dkt. 52-3, ¶¶ 10-11; dkt. 52-6 at 77–83. Dr. Person attested that he questioned Mr. Bledsoe about the history of his knee pain, but Mr. Bledsoe denied having an instigating injury. *Id.* Upon physical exam, Mr. Bledsoe had active range of motion but pain, he walked with a limp, and there was mild swelling and tenderness of the knee. *Id.* The patella "was normal with mild crepitation and no atrophy." *Id.* Dr. Person conducted a posterior and anterior drawer test, "a physical examination doctors use to test the cruciate ligaments in the knee for rupture or injury." *Id.* The tests were normal, and Dr. Person diagnosed Mr. Bledsoe with leg joint swelling, "a clinical manifestation of a gout flareup," and he prescribed Allopurinal to reduce uric acid caused by gout. *Id.* He also issued Mr. Bledsoe a bottom bunk pass for six weeks. *Id.* Dr. Person determined that if Mr. Bledsoe's symptoms persisted, he may need an arthrocentesis, "a clinical procedure of using a syringe to collect synovial fluid from a joint capsule." *Id.* Finally, he prescribed Tylenol 325 mg for breakthrough pain. *Id.*

Dr. Person's interactions with Mr. Bledsoe occurred when he was employed by Corizon. He had no interactions with Mr. Bledsoe once Wexford became the provider for the IDOC, though he continued to work for Wexford at CIF.

### 3. Nurse Dawson Interactions

Nurse Dawson first saw Mr. Bledsoe on June 26, 2017, and assessed him for hypertension and gout in his knee. Dkt. 58-8, ¶¶ 6-7; dkt. 58-9; dkt. 58-10; dkt. 58-11. She noted that Mr. Bledsoe's knee was swollen, and based on his pain, she prescribed Ibuprofen 600 mg.[3] *Id.* She ordered x-rays of his knee "to monitor the gout assessment" and requested a follow-up appointment to review the x-ray results with Mr. Bledsoe. *Id.*

Nurse Dawson next saw Mr. Bledsoe on September 25, 2017, and noted his history of knee effusion, "water in or around the knee typically caused by arthritis." Dkt. 58-8, ¶¶ 8-12; dkt. 58-12; dkt. 58-13; dkt. 58-14. His x-ray results showed that he had osteoarthritis in his right knee. *Id.* The typical treatment for this common ailment that is more prevalent as a patient ages is provision of an NSAID or Tylenol and physical therapy. *Id.* Nurse Dawson prescribed Tylenol 325 mg for pain, and Mr. Bledsoe was able to purchase additional over the counter medication from commissary. *Id.* She submitted referrals for Mr. Bledsoe to be seen by an orthopedic specialist and a physical therapist. *Id.*

The on-site physical therapist saw Mr. Bledsoe multiple times in October and November 2017, and he received a knee brace during this time. Dkt. 58-8, ¶¶ 13-16; dkt. 58-15; dkt. 58-16; dkt. 58-17; dkt. 58-18; dkt. 58-21. Nurse Dawson was informed on November 17, 2017 that Mr. Bledsoe missed several doses of Mobic, and she discontinued it due to his noncompliance with taking it. Dkt. 58-8, ¶ 17; dkt. 58-19; dkt. 58-20.

On December 1, 2017, Nurse Dawson requested a low bunk pass for Mr. Bledsoe due to his knee pain and his use of a knee brace. Dkt. 58-22. She saw him again on December 5, 2017,

---

[3] Ibuprofen is a Non-Steroidal Anti-Inflammatory ("NSAID") used to treat a variety of pain types. Dkt. 58-8, ¶ 7. "600 mg is the second-highest dosage of Ibuprofen available to prescribe for pain, with 800 mg representing the highest single dosage of the medication." *Id.*

and he reported his pain was stable. Dkt. 58-8, ¶¶ 20-21; dkt. 58-23; dkt. 58-24. Nurse Dawson renewed a prescription of Mobic for pain, and Mr. Bledsoe received a final physical therapy appointment that day. *Id.* Mr. Bledsoe received another knee brace on June 22, 2018. Dkt. 58-25.

Nurse Dawson attested that "at various points" Mr. Bledsoe's medical records reflect his 2015 MRI results that indicated a "complex medial tear" of the meniscus. Dkt. 58-8, ¶¶ 23-26. The menisci in the knee "serve the primary functions of absorbing shock and dispersing body weight to reduce friction in the knee," and there are several variations of tears, in which certain types determine the treatment. *Id.* Mr. Bledsoe's tear was "complex" or a "combination of tear patterns" that are "more common in elderly patients and carry the risk of osteoarthritic changes." *Id.* Complex tears are typically not treated with meniscus repair because of the nature of the tear patterns. *Id.* Thus, there are generally three courses of treatment that include first, rest, ice, compression, and elevation ("RICE"); then exercise and physical therapy; followed by anti-inflammatories. *Id.* Nurse Dawson attested that "[t]he majority of meniscus tears heal on their own given a period of rest followed by rehabilitation." *Id.* If this first-line treatment is not successful, treatment progresses to surgical removal of the meniscus, and then to a third-line treatment of meniscus repair. *Id.* "This surgical intervention is the most intrusive and is not guaranteed to be effective long-term," but if the injury does not heal and the second-line treatment cannot resolve the issues, "this may be the only remaining option if more conservative treatment has been tried and failed." *Id.*

### 4. HSA Scism's Response to Mr. Bledsoe's Grievance

HSA Scism responded to a grievance that Mr. Bledsoe filed in March 2018,[4] which

---

[4] Mr. Bledsoe's grievance is numbered 101115 and states: "For over a year I have been fillin[g] out healthcare form after health care form tryin[g] to get something done about the torn muscle in my right knee. All my cr[ies] has fallen on deaf ears and I can't take the pain any longer. Ever[y]

related to his knee pain. Dkt. 58-5, ¶ 4. HSA Scism issued his response within five business days, and in order to prepare his response,[5] reviewed Mr. Bledsoe's medical records and spoke to the on-site provider. *Id.*, ¶ 5. HSA Scism noted that Mr. Bledsoe had been seen multiple times by providers about his knee, was prescribed various medications for the complaints, was referred to physical therapy, and an off-site consult had been sought. *Id.* He "advised Mr. Bledsoe that if such off-site referral was approved that we would schedule Mr. Bledsoe for such appointment." *Id.* This was HSA Scism's sole interaction with Mr. Bledsoe. *Id.*, ¶ 7.

### 5. Treatment Subsequent to Filing of Lawsuit

Mr. Bledsoe testified that he received surgery in 2019, after the filing of this lawsuit. Dkt. 58-1 at 92 (plaintiff stated he believed he had surgery in late April 2019).

### IV. Discussion

### A. Exhaustion of Claims Against Corizon Defendants[6]

The Corizon defendants argue that Mr. Bledsoe did not file any grievances for any medical

---

time I put a health form in all that happens is they take $5 dollars from me [and] tells me the same thing or they give me a different medicine that doesn't help. And I'm tired of it. I would like something done A.S.A.P" Dkt. 58-6. The Court notes that grievance 101115 was fully exhausted; the level-I formal grievance was received on March 5, 2018, and the level-II formal appeal was received on April 12, 2018. Dkt. 52-7.

[5] In most relevant part, HSA Scism responded: "I have spoken with our physician about the case and it is his opinion that we should pursue the possibility of an outside consult with an orthopedic specialist. That "OPR" request has been submitted to Wexford medical management for consideration. If approved, we will schedule Mr. Bledsoe for that appointment." Dkt. 58-7.

[6] On March 6, 2020, defendants Lawrence, Liaw, and Person filed a motion for leave to amend their answer after learning in Mr. Bledsoe's deposition that some of his claims date back to 2015. Dkt. 58-1 at 22-23 (Bledsoe deposition); dkt. 47. The Court granted this motion and permitted these defendants to file a partial motion for summary judgment "on the issues of failure to exhaust and statute of limitations, in addition to any other issues they intend to raise on summary judgment" rather than to reset the entire pretrial schedule and cause undue delay. *Id.*

issues, "let alone those related to his knee pain during his incarceration at [WCF] in 2015." Dkt. 51 at 10. Similarly, Corizon defendants argue that Mr. Bledose did not file any grievances while he was at CIF between 2016 and 2017. *Id.* at 13. Mr. Bledsoe did not file a grievance regarding his knee pain until February 28, 2018—after Corizon's tenure had expired and during Wexford's tenure. *Id.* Thus, the Corizon defendants contend that Mr. Bledsoe failed to exhaust his administrative remedies pursuant to the IDOC Offender Grievance Process and pursuant to the requirements of the Prison Litigation Reform Act ("PLRA"). *Id.* at 17. The Corizon defendants argue that Mr. Bledsoe's 2018 grievance addressed Wexford's medical care, and "[t]his dooms his case against Corizon Defendants under the PLRA." *Id.* at 18.

Exhaustion of administrative remedies is an affirmative defense for which a defendant bears the burden of proof, and that must be resolved before reaching the merits. *Pavey v. Conley*, 544 F.3d 739, 740–42 (7th Cir. 2008); *Perez v. Wis. Dep't Corr.*, 182 F.3d 532, 536 (7th Cir. 1999) ("The statute [requiring administrative exhaustion] can function properly only if the judge resolves disputes about its application before turning to any other issue in the suit."). While Mr. Bledsoe's grievance history shows that he did not file grievances between 2015 and 2017, his 2018 grievance established that his knee issues had been ongoing, spanning both Corizon's and Wexford's tenure. *See, e.g.*, *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013). ("A violation is continuing where it would be unreasonable to require or even permit [a prisoner] to sue separately over every incident of the defendant's unlawful conduct."). Moreover, Dr. Person and Nurse Dawson continued their employment through the transition between the entities, had or continued to treat Mr. Bledsoe for his knee, and continued to have the capacity to treat him in their positions at the facility. The Corizon defendants have not shown how a contractual transition affects the IDOC Offender Grievance Process. Moreover, it would seem implausible to require Mr. Bledsoe, who was treated

at CIF for a short time in 2017 before the contractual changes and who continued to be treated at the same facility after those changes, to have known that he needed to or should have grieved this issue prior to April 1, 2017. Corizon defendants have not established that Mr. Bledsoe failed to exhaust administrative remedies.

### B. Statute of Limitations of Claims Against Andrew Liaw

The claim against Dr. Liaw fails, even based on a theory of continuing harm. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (citing *West v. Atkins*, 487 U.S. 42, 48 ((1988)). Suits under § 1983 use the statute of limitations and tolling rules that states employ for personal-injury claims. In Indiana, the applicable statute of limitations period is two years. *See Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012); Ind. Code § 34-11-2-4.

At the very latest, Dr. Liaw's medical care of the plaintiff ceased when Mr. Bledsoe was paroled on June 29, 2015 and released from WCF. *See Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2011) (finding that statute of limitations in Eighth Amendment refusal to treat case began to run when plaintiff left the jail). Mr. Bledsoe testified that he last saw Dr. Liaw in 2015. Dkt. 58-1 at 30–31. Based upon the two-year statute of limitations, Mr. Bledsoe had until June 29, 2017 to file suit against Dr. Liaw but did not bring this action until December 28, 2018.

Accordingly, **the Eighth Amendment claim against Dr. Liaw is barred**, and he is entitled to summary judgment.

### C. Deliberate Indifference

At all times relevant to Mr. Bledsoe's claims, he was a convicted inmate so his deliberate

indifference claims are evaluated under the Eighth Amendment. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019).

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). The "subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

Mr. Bledsoe does not have a constitutional right to demand specific medications or treatment. *Arnett v. Webster*, 658 F.3d 742,754 (7th Cir. 2011) ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible . . . ." Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm.").

"A medical professional is entitled to a deference in treatment decisions unless no minimally competent professional would have [recommended the same] under the circumstances." *Pyles*, 771 F.3d at 409. "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted).

The Eighth Amendment does not require prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment or to administer the least painful treatment. *Snipes v. DeTella*, 95 F.3d 586,592 (7th Cir. 1996); *see also Howell v. Wexford Health Sources, Inc.,* 987

F.3d 647, 660 (7th Cir. 2021) ("It is not unusual outside of prisons for patients with painful orthopedic problems to be told to try more conservative treatment, delaying surgery until it appears that nothing less will offer effective relief.").

Here, the defendants do not dispute that Mr. Bledsoe's condition was an objectively serious medical need. Dkt. 51 at 21; dkt. 57 at 11. Rather, they argue that they are entitled to summary judgment because Mr. Bledsoe cannot show that they were deliberately indifferent. In his deposition, Mr. Bledsoe had difficulty remembering the individual defendants and what each specifically did that caused him to file this lawsuit. *See* dkt. 58-1. He stated that he had seen many people over several years for treatment but "[n]othing they did worked until I got my surgery, and it still hurts now off and on, but it's not as bad as it was." *Id.* at 40. He stated that he was given the "run around" for two years when he needed to see an outside provider, and it was only after the filing of the lawsuit that he underwent surgery in 2019. *Id.* at 47, 92. The Court reviews the designated evidence related to each remaining defendant below.

### 1. Dr. Person

Dr. Person saw Mr. Bledsoe on two occasions for his knee issues in early 2017. He conducted a physical exam during each visit, noting tenderness and that Mr. Bledsoe was experiencing pain. Because there was no reported history of arthritis or trauma to the knee, Dr. Person relied on his experience and medical judgment to conclude that Mr. Bledsoe likely had a gout flare-up—which mimics the former. He prescribed a corticosteroid to treat the inflammation. When Mr. Bledsoe's symptoms were unresolved, he performed drawer tests to investigate a rupture or injury to the knee, but the results were normal. He prescribed Allopurinol to attempt to reduce uric acid for gout. Dr. Person issued a bottom bunk pass to Mr. Bledsoe for the time being and Tylenol for any breakthrough pain. He also noted if symptoms persisted,

synovial fluid may need to be removed from the knee. As evidenced by the actions Dr. Person took, he did not ignore Mr. Bledsoe's symptoms or pain. Simply because Mr. Bledsoe wanted different or more aggressive treatment does not establish that Dr. Person was deliberately indifferent to his condition or ran afoul of treatment that would have been provided by other minimally competent health care providers.

"The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Pyles*, 771 F.3d at 409 (where prisoner wanted different treatment because his medications were not helping, his disagreement with the physician did not allow him to prevail on his Eighth Amendment claim where the physician's choice of treatment was not blatantly inappropriate). Mr. Bledsoe has not made such a showing.

Because no reasonable juror could find that Dr. Person was deliberately indifferent to Mr. Bledsoe's medical needs, he is entitled to summary judgment.

### 2. Nurse Lawrence

Mr. Bledsoe testified that he wanted Nurse Lawrence to give him pain medication because what he was taking was not working. Dkt. 58-1 at 46. But it is undisputed that Nurse Lawrence's role as a registered nurse does not involve diagnosing medical conditions, ordering medical treatment, or prescribing medications. Dkt. 52-4, ¶ 6. Nurse Lawrence is able to "triage offenders and communicate their medical needs to the provider and then follow the provider's orders" and "provide life-saving medical care in emergent situations." *Id.* Nurse Lawrence examined Mr. Bledsoe's knee, noted that he had range of motion but some stiffness, gave him an ace wrap and instructed him to rest, elevate, and ice his knee. Moreover, Nurse Dawson attested that first-

line treatment for a meniscus tear, Mr. Bledsoe's diagnosis, was to employ this "RICE" method. Dkt. 58-8, ¶ 25. Further, Nurse Lawrence referred Mr. Bledsoe to see the provider after her initial exam with him, rescheduled his missed appointment, counseled him to take his medication as prescribed, and again communicated to him that he would see the provider for follow-up in relation to his knee pain. The record does not indicate that Mr. Bledsoe's symptoms were of the kind that needed life-saving care.

Nurse Lawrence's care matched the parameters of her position as a nurse at the facility. Mr. Bledsoe cannot demand specific care, and certainly cannot expect to hold a nurse liable for care that she was unable to provide. Because no reasonable juror could find that Nurse Lawrence was deliberately indifferent to Mr. Bledsoe's medical needs, she is entitled to summary judgment as a matter of law.

### 3. Nurse Practitioner Dawson

Mr. Bledsoe testified that his claims against Nurse Dawson were the same as Nurse Lawrence, *i.e.*, that she would not change his medication and did nothing but increase Mobic which was not working. Dkt. 58-1 at 49. Similar to the other defendants, the record demonstrates that Nurse Dawson did not ignore Mr. Bledsoe's knee pain. Instead, she prescribed pain medication, inclusive of the second-highest dosage of Ibuprofen, and later, Tylenol and Mobic. Further, she advised him that he could purchase additional pain medication from commissary. She ordered x-rays to monitor the gout assessment and referred Mr. Bledsoe to physical therapy and to see an orthopedic specialist based upon the results. Even after Mr. Bledsoe was shown to be non-complaint in taking Mobic, Nurse Dawson still renewed it for him. Nurse Dawson outlined the typical tiered courses of treatment for Mr. Bledsoe's meniscus tear which ranged from the first-

line care that she and other defendants attempted, to the most advanced stages of surgical intervention.

Based upon the provision of her medical care and her reasoning behind it, no reasonable juror could find that Nurse Practitioner Dawson was deliberately indifferent to Mr. Bledsoe's medical needs, and therefore, she is entitled to summary judgment.

### 4. HSA J. Scism

Mr. Bledsoe testified that he believed that HSA Scism could have done more in response to his grievance. Dkt. 58-1 at 74–75. However, it is undisputed that the HSA responds to formal grievances from inmates concerning medical care, and that this role is "administrative as opposed to clinical." Dkt. 58-5, ¶ 3. The record indicates that the HSA timely responded to Mr. Bledsoe's grievance, reviewed his medical records, and spoke to the on-site provider. The HSA learned that Mr. Bledsoe's treatment included prescription medications for his knee, a referral for physical therapy, and a referral for an off-site consult that *if* approved, would result in scheduling Mr. Bledsoe for an appointment. HSA Scism "could not direct a patient's course of treatment," diagnose, or approve referrals. *Id.*, ¶ 6.

Though Mr. Bledsoe wanted HSA Scism to take further action, that was not within the scope of his duties. The record demonstrates that HSA Scism investigated the status of Mr. Bledsoe's care, learned that he was receiving active, progressive treatment, and responded to the grievance accordingly. Further, there is no constitutional right to a grievance system, *see Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011), and the denial of a grievance, by itself, is not a federal claim. *See Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017) ("Prison officials who simply processed or reviewed inmate grievances lack personal involvement in the conduct forming the basis of the grievance."). There is no evidence that suggests that HSA Scism knew of any

substantial risk of harm to Mr. Bledsoe and disregarded such risk. Rather, the grievance response indicates that HSA Scism was aware that Mr. Bledsoe was being treated for his condition and that more aggressive treatment had been sought or was contemplated.

Because no reasonable juror could find that HSA J. Scism was deliberately indifferent to Mr. Bledsoe's medical needs, he is entitled to summary judgment.

## V. Conclusion

For the reason discussed above, the defendants' unopposed motions for summary judgment, dkt. [50] and dkt. [56], are **granted**.

Judgment consistent with this Order shall now issue.

**SO ORDERED.**

Date: 3/30/2021

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

TYRONE BLEDSOE
852009
WESTVILLE - CF
WESTVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Adriana Katzen
BLEEKE DILLON CRANDALL ATTORNEYS
adriana@bleekedilloncrandall.com